## UNITED STATES DISTRICT COURT
## DISTRICT OF NEBRASKA

| | |
|---|---|
| RICHARD MASUD, *Individually and On Behalf of All Others Similarly Situated*,<br><br>            Plaintiff,<br><br>    v.<br><br>TD AMERITRADE, INC., and TD AMERITRADE CLEARING, INC.,<br><br>            Defendants. | Case No. |

## CLASS ACTION COMPLAINT

Plaintiff Richard Masud ("Masud") ("Plaintiff"), on behalf of himself and all others similarly situated, brings this action as a class action against Defendants TD Ameritrade, Inc. ("TDA") and TD Ameritrade Clearing, Inc. ("TDAC") (together, "TD Ameritrade").

### INTRODUCTION

1.      A cash sweep account is a type of bank or brokerage account that is linked to an investment account and automatically transfers funds when the balance is above or below a preset minimum. Typically, this is used to sweep excess cash into a money market fund, where it will earn more interest than an ordinary bank account. This case arises from TD Ameritrade's exploitative and unfair implementation of its "Sweep Program" resulting in the breach of its fiduciary duties

owed to Plaintiff and similarly situated retirement account investors as their investment advisors and their contractual obligation to operate the Sweep Program in accordance with "all applicable (for example, ERISA and the Internal Revenue Code) and state laws …."

2.     Specifically, when acting as its customers' agents and fiduciaries, TD Ameritrade "swept" uninvested cash balances in its customers' accounts and deposits that cash into accounts located at its Affiliated Banks (defined below). Because the Affiliated Banks' accounts pay far below market rates of interest, Plaintiff and other Class members lost significant amounts of interest they would have otherwise earned had TD Ameritrade swept their uninvested cash into bank accounts that pay a reasonable market interest rate.

3.     In its agreements with its customers, TD Ameritrade specifically acknowledged that it acts as its customers' "agent" and fiduciary in establishing, maintaining, and operating the Sweep Program. Under the broad scope of the agency, TD Ameritrade selected the banks to participate in the Sweep Program, the type of accounts to which the Sweep Program applies, the type of bank accounts in which the TD Ameritrade customers' funds were swept, the negotiation and agreement as to the interest rates to be paid to TD Ameritrade's customers under the Sweep Program, and the negotiation and agreement as to any compensation or the foregoing of such compensation by TD Ameritrade for the benefit of either its customers or another entity, including the Affiliated Banks.

4.      From 2018 through March 2019, and again from March 2022 onwards, when the Federal Reserve began raising the target federal funds rate, the reasonable value of swept cash consistently exceeded the amounts paid by TD Ameritrade on sweep accounts. Comparable brokerages such as Fidelity Investments, R.W. Baird, Robinhood, and Vanguard Investments, which did not sweep cash to affiliated banks, but rather swept cash to independent, unaffiliated banks, paid substantially higher rates on swept cash, than TD Ameritrade paid. For example, Fidelity paid retirement investors as much as 2.72% APY on swept cash regardless of AUM, starting in August 2023, and R.W. Baird paid retirement investors between 2.07% to 4.15% on swept cash, depending on cash balances, as of September 8, 2023. By contrast, TD Ameritrade paid rates as low as 0.01%.

5.      Other metrics, including the federal funds rate, and rates paid by online banks, and government money market funds, further evidence that the paltry rates paid by TD Ameritrade on retirement sweep accounts were not reasonable.

6.      TD Ameritrade breached its fiduciary duties when it placed its customers' cash in low interest-bearing accounts held by its own Affiliated Banks and then pocketed the unpaid interest as additional profit.

7.      TD Ameritrade failed to adequately disclose to its customers that, as to the Sweep Program, it was essentially providing a kickback to its own affiliates at its customers' expense. Specifically, TD Ameritrade shortchanged their customers

for their and their affiliates' benefit by negotiating with the Affiliated Banks one-sided transactions that swept cash into exceedingly low-interest accounts. TD Ameritrade failed to disclose and discuss these conflicted transactions, much less obtain informed consent from its customers and principals.

8.      In November 2019, Charles Schwab Corporation. ("Schwab Corp.") announced that it entered into an agreement with TD Ameritrade Holding Corporation to acquire it and its subsidiaries, including TDA. and TDAC, in an all-stock transaction valued at approximately $26 billion.  Schwab Corp. closed the acquisition in October 2020 and then spent more than three years preparing to move TD Ameritrade's customers onto its platform, a process which it completed on or about September 5, 2023. After that transition was complete, all of TD Ameritrade's services and accounts were fully consolidated under Schwab Corp. and its brokerage firm, Charles Schwab & Co., Inc. ("Schwab & Co."). Nevertheless, TDA and TDAC continue to exist as active corporations.

9.      Plaintiff brings this action individually and on behalf of a nationwide Class of similarly situated individuals against TD Ameritrade, and only for the period in which Class member's retirement accounts were custodied and maintained by TDA and/or TDAC. The claims alleged in the Complaint are not for the accounts of the Plaintiff or any class members following the move of their TD Ameritrade's customers onto the Charles Schwab platform, meaning this Complaint does not

allege claims against Schwab Corp. and its brokerage firm, Schwab & Co., concerning funds swept from Plaintiff's or other retirement accounts to affiliated banks through a Charles Schwab sweep program, and such claims are excluded from the proposed class definition.

10.    Plaintiff's claims against Ameritrade include breach of fiduciary duty, breach of contract, breach of the implied covenant of good faith and fair dealing, and, in the alternative, unjust enrichment. The Complaint also alleges a California Subclass to bring a claim for violation of California's Unfair Competition Law ("UCL"). These causes of action seek to recover damages arising out of TD Ameritrade's violations of the law, and for such other relief as the Court may deem just and proper.

## JURISDICTION AND VENUE

11.    This Court has original jurisdiction over the subject matter of this action under 28 U.S.C. §1332(d)(2), as this action is brought as a class action on behalf of Class members, one or more members of the class are citizens of a state different than the Defendants, and the amount in controversy exceeds five million dollars ($5,000,000), exclusive of interest and costs.

12.    The Court has personal jurisdiction over Defendant because TDA and TDAC both have their principal place of business here, TDAC is incorporated under Nebraska law, and because both corporations do substantial business in this District.

Additionally, TDA and TDAC's agreements with Plaintiff contain a forum selection clause stating their "consent to the jurisdiction and venue within the State of Nebraska for all disputed arising out of or relating to this Agreement."

13.    Venue is proper under 28 U.S.C. § 1391 because among other things a substantial part of the events, omissions, and/or relevant conduct by Defendant giving rise to Plaintiff's claims occurred in this District and because of the forum selection clause in Plaintiff's agreements, referenced above.

## PARTIES

### A. Plaintiff

14.    At all relevant times, Plaintiff Masud was a TD Ameritrade customer and is a resident and citizen of Pasadena, California.

15.    Plaintiff Masud maintained a retirement account with TD Ameritrade, the Richard Masud Rollover TD IRA (the "Masud IRA"), which he opened in January 2016. The Masud IRA is a brokerage account with TD Ameritrade in which cash was held over the course of the life of the account.

16.    While Plaintiff was a TD Ameritrade customer, the cash held in the Masud IRA was automatically "swept" into a low interest-bearing bank account at Affiliated Banks pursuant to the Sweep Program. Specifically, TD Ameritrade chose to sweep uninvested cash in the Masud IRA into a TD Ameritrade FDIC Insured Deposit Account ("IDA").

**B. Defendants**

17.    Defendant TDA is a financial services firm based in the U.S. with operations worldwide, including California. TD Ameritrade is a New York corporation with its headquarters in Omaha, Nebraska

18.    Defendant TDAC is a financial services firm based in the U.S. with operations worldwide, including California. TDAC is a Nebraska corporation with its headquarters in Omaha, Nebraska.

## FACTUAL BACKGROUND

**A. TD Ameritrade's Customer Relationship**

19.    The relationship between TD Ameritrade and its customers, including Plaintiff, is set forth in a written Client Agreement.

20.    Through their assent to the Client Agreement, customers including Plaintiff consented to their participation in the Sweep Program.

21.    The Client Agreement states that TD Ameritrade acts as customers' "agent" in opening deposit accounts at Program Banks and automatically sweeping money into those accounts.

22.    By entering a custodial and agency relationship with Plaintiff and members of the putative Class, TD Ameritrade assumed fiduciary duties including the duty of loyalty, the duty of care, the duty to act in good faith, the duty of full and fair disclosures, and the duty to make prudent investment recommendations. These

fiduciary duties are meant to always ensure TD Ameritrade acts with integrity and in the best interests of the client.

23.     TD Ameritrade's fiduciary duties to as broker-dealers are described in Regulation Best Interest (Reg BI) under the Securities Exchange Act of 1934, which requires them to act in the best interests of the retail customer at the time a recommendation is made. Reg BI obligations broker-dealers, when making an investment recommendation, to meet four core obligations: *Disclosure* (providing certain prescribed disclosure before or at the time of recommendation, about the recommendation and the relationship between the retail customer and the broker-dealer); *Care* (exercising reasonable diligence, care, and skill in making the recommendation); *Conflicts of Interest* (establishing, maintaining, and enforcing policies and procedures reasonably designed to address conflicts of interest); and *Compliance* (establishing, maintaining, and enforcing policies and procedures reasonably designed to achieve compliance with Reg BI).

**B. The Sweep Program**

24.     A "sweep program" is a "service provided by a broker or dealer where it offers to its customer the option to automatically transfer free credit balances in the securities account of the customer to either a money market mutual fund product as described in § 270.2a-7 or an account at a bank whose deposits are insured by the Federal Deposit Insurance Corporation." See 17 CFR 240.15c3-3(a)(17).

25.     Sweep deposits play a pivotal role as a capital source for banks, empowering them to utilize these deposits for various corporate purposes. This includes activities such as making loans or investing in government securities. The disparity between the interest rate paid and the interest rate earned by a bank on those deposits is commonly referred to as the net interest margin.

26.     The SEC, in its Staff Bulletin: Standards of Conduct for Broker-Dealers and Investment Advisers Conflicts of Interest, issued August 3, 2022, emphasized that "cash sweep programs" are a "common source[ ] of conflicts of interest." *See* https://www.sec.gov/tm/iabd-staff-bulletin-conflicts-interest.

27.     When customers opened a retirement account with TD Ameritrade, they were automatically placed into the Sweep Program. Although the Sweep Program supposedly provided customers with three "Sweep Choices," customers like Plaintiff had his cash swept into the IDA as their "Designated Sweep Vehicle" by default.

28.     Under the terms of the Client Agreement, if the IDA was the Designated Sweep Vehicle, available cash in the retirement account would be automatically deposited in an IDA at an Affiliated Bank owned by TD Ameritrade. Prior to Charles Schwab's acquisition of TD Ameritrade, IDAs were held at banks owned by TD Ameritrade's parent company, TD Bank Group, including TD Bank, N.A. and TD Bank USA, N.A. After Charles Schwab acquired TD Ameritrade and

before the retirement accounts were moved to the Charles Schwab platform, IDAs were held at banks owned by Charles Schwab (and, as disclosed on Plaintiff's account statements, "each an affiliate of TD Ameritrade"), including Charles Schwab Bank, SSB; Charles Schwab Premier Bank, SSB; and Charles Schwab Trust Bank.

29.    According to the Client Agreement, Affiliated Banks were the exclusive option for cash swept into IDAs pursuant to the Sweep Program. TD Ameritrade directed all accounts participating in IDA Sweep Program, including Plaintiff, to its Affiliated Banks.

30.    The Client Agreement also incorporates by reference "Applicable Rules," defined as "all applicable federal (for example, ERISA and Internal Revenue Code) and state laws, rules and regulations, rules of any self-regulatory organization, and constitution and applicable rules, regulations, customs, and usages of the exchange or market and its trading house."

31.    The Client Agreement acknowledges that TD Ameritrade may be held liable to its customers for violating the "Applicable Rules."

32.    TD Ameritrade acted as its customers' agent and exercised discretion with respect to the Sweep Program. For example, the Client Agreement states: "I authorize you to automatically withdraw cash or redeem securities maintained in a Designated Sweep Vehicle to satisfy my Account's obligations. I authorize you to

act as my agent to purchase and redeem balances in the Designated Sweep Vehicles, and authorize you to select and use agents as you deem appropriate."

33.    The Client Agreement also affords TD Ameritrade additional discretion as Plaintiff's agent concerning the IDAs. For example, it states that "All withdrawals necessary to satisfy debts in my Account will be made by [TDAC], as my agent[,]" and that "[TDAC] will act as may agent in depositing funds into the IDAs and withdrawing funds from the IDAs."

34.    TD Ameritrade exercised its discretion concerning the Sweep Program in bad faith to the detriment of its customers.

35.    The Sweep Program primarily benefited TD Ameritrade and its affiliates at the expense of its customers.

36.    TD Ameritrade entered transactions by which it established and paid unreasonably low interest rates to its customers in the Sweep Program. In contrast to the unreasonably low returns TD Ameritrade paid its customers, TD Ameritrade shifted to its Affiliated Banks a substantial portion of the beneficial returns on its customers' cash.

37.    The Client Agreement disclosed that "The Banks use IDA balances to fund current and new investment and lending activity. The Banks seek to make a profit by achieving a positive spread between their cost of funds (for example, deposits) and the return on their assets, net of expenses." Thus, TD Ameritrade

11

admitted that by keeping the interest rates in Plaintiff's and Class members' IDAs lower, it earned a higher profit.

38.     Through the operation of the Sweep Program, TD Ameritrade engaged in self-dealing, creating a profit center that benefits only them, to the financial detriment of their customers.

## C. TD Ameritrade's Disclosures to Its Customers Regarding the Sweep Program Contained Material Misrepresentations and Omissions

39.     TD Ameritrade's disclosures contained material misrepresentations and omissions regarding the Sweep Program.

40.     The Client Agreement stated: "The interest rates paid with respect to the IDAs may be *higher or lower* than the interest rates available to depositors making deposits directly with the Banks or other depository institutions in comparable accounts." (Emphasis added). This statement wase false and misleading because, as TD Ameritrade knew at the time its customers entered the Sweep Program, the interest rate on the cash sweep deposit account *will be lower* than yields on essentially any other available cash alternatives.

41.     The Client Agreement also stated: "The Banks will determine interest rates on the IDAs at their discretion based upon a variety of factors, including prevailing economic and business conditions, and the nature and scope of your relationship with the Banks." This statement was false and misleading because it omits TD Ameritrade's role in the process and TD Ameritrade's ability to influence

12

the interest rates the Affiliated Banks set.

42.     TD Ameritrade's failed to fairly disclose the interest rates the Sweep Program offers. Conversely, TD Ameritrade's never disclosed the interest rates its customers' IDAs could have earned if their customers' sweep funds had been invested in comparable accounts with non-affiliated banks. This was a material omission of facts that customers would have found important in decided whether to use TD Ameritrade as their investment advisor.

43.     The Client Agreement's statements concerning the spread that its Affiliated Banks earned by participating in the Sweep Program omitted material facts and were misleading because they did not adequately explain the size of the spread or how the spread impacts the interest rates customers are paid when being automatically enrolled in the Sweep Program. Specifically, TD Ameritrade failed to disclose TD Ameritrade used its discretion to negotiate and enter transactions with the Affiliated Banks regarding the Sweep Program pursuant to which TD Ameritrade agreed to artificially low interest rates for its customers' cash in the Sweep Program to the benefit of the Affiliated Banks, then declined to charge the Affiliated Banks customary fees for the Sweep Program. Through this scheme, TD Ameritrade shifted to the Affiliated Banks large returns on its' customers cash without obtaining customary fees it would normally incur if working with a non-affiliated bank. Thus, TD Ameritrade put the interests of itself and its Affiliated Banks ahead of the

interests of its customers, including Plaintiff and Class members.

**B. TD Ameritrade Knew or Should Have Known the Sweep Program Must Provide a Reasonable Rate of Interest to Retirement Account Investors**

44.     TD Ameritrade acknowledged the duty to operate the Sweep Program in accordance with Applicable Rules.

45.     The Applicable Rules required TD Ameritrade to offer retirement accounts investors whose cash was swept into the IDAs a reasonable rate of interest.

46.     The requirement to pay a reasonable rate of interest derives from the Internal Revenue Code ("IRC"). Section 4975 of the IRC (entitled "Tax on Prohibited Transactions"), applies to IRAs generally, including Plaintiff's IRA. *See* 26 U.S.C. §4975(e)(1)(B) (defining "plan" to include "an individual retirement account described in [IRC] Section 408(a)").

47.     IRC §4975(c)(1)(B) defines as a "prohibited transaction" the "lending of money or other extension of credit between a plan [i.e., an individual IRA] and a disqualified person." A "disqualified person," under Section 4975(e)(2) includes, among others, "a fiduciary" and "a person providing services to the plan."

48.     TD Ameritrade and the Affiliated Banks are "disqualified person[s]" under Section 4975(e)(2) and, therefore, the sweep agreement into IDAs for retirement accounts between Plaintiff and Ameritrade are "prohibited transaction[s]" under § 4975(c)(1)(B).

49.     IRC §4975(d)(4) provides several "exemptions," or safe harbors, for otherwise "prohibited transactions," one of which is "the investment of all or part of a plan's assets in deposits *which bear a reasonable interest rate* in a bank or similar financial institution." (Emphasis added).

50.     Section 4975 recognizes that related party transactions into which customers are defaulted (such as the Sweep Program) can offer interest rates that may become unfairly lowered due to inherent conflicts of interest. Accordingly, conflicted transactions such as affiliated entity cash sweeps are required to pay a reasonable rate of interest. Retirement account customers are particularly vulnerable to receiving inadequate compensation for the use of uninvested cash in their accounts. IRC Section 4975 thus seeks to ensure related party transactions involving retirement accounts are priced at fair market rates.

51.     Regulations promulgated by the Department of the Treasury confirm that cash swept to an affiliated bank is a "prohibited transaction" but would be permissible (i.e., be within the exemption or safe harbor) if it paid "a reasonable rate of interest." Thus, Treasury regulations state that "Section 4975(d)(4) exempts from the excise taxes imposed by section 4975 investment of all or a part of a plan's assets in deposits bearing a reasonable rate of interest in a bank or similar financial institution…, even though such bank or similar financial institution is a fiduciary or other disqualified person with respect to the plan." 26 C.F.R. §54.4975-6(b)(1).

52.     Treasury regulations also mandate that when a financial institution "invests plan assets in deposits in itself or its affiliates under an authorization contained in a plan or trust instrument," the authorization "must name" the institution and "must state that [it] … may make investments in deposits which bear a reasonable rate of interest in itself (or in an affiliate)." *Id.* § 54.4975-6(b)(3).

53.     Similarly, ERISA Section 408(b)(1) exempts from prohibition various interested party transactions that "bear a reasonable rate of interest," among other requirements. *See* 29 U.S.C. §1108(b)(1).

54.     Additionally, FINRA Rule 2122 expressly provides that "[c]harges, if any, for services performed . . . shall be reasonable and not unfairly discriminatory among customers."

### C. TD Ameritrade Placed Class Members' Cash in Shockingly Low Interest-Bearing Accounts at Its Affiliated Banks

55.     TD Ameritrade breached its fiduciary and contractual duties by failing to negotiate higher and reasonable interest rates for its customers' uninvested cash in operating the Sweep Program.

56.     As its customers' agent and financial advisor, TD Ameritrade was contractually and legally obligated to act in the best interest of its customers, but it violated those obligations by negotiating of unreasonably low interest rates with Affiliated Banks.

57.     TD Ameritrade did not negotiate higher and reasonable rates of

interest for its customers' cash sweep deposits, but instead it worked with its Affiliated Banks to set artificially and unreasonably low interest rates for deposit accounts in the Sweep Program.

58.    TD Ameritrade's low interest rates are not reasonable. Section 4975 and ERISA Section 408 place the burden of demonstrating reasonableness on the financial institution. TD Ameritrade cannot meet this burden because the interest rates used in the Sweep Program do not meet any definition of a reasonable rate.

59.    Based on its ordinary meaning (using Webster's and Oxford dictionary definitions), "reasonable" is synonymous with "fair." Accordingly, "reasonable" in the valuation context is synonymous with "fair market value" and can be determined using a market approach of comparable instruments. A reasonable rate of interest is the rate that would result in a competitive market under fair market conditions – in other words, an interest rate parties would agree to in an arm's length transaction where neither party is about exert market power over the other.

60.    Fair market value is defined by the IRS as: "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." 26 C.F.R. § 25.2512-1.

61.    IRS regulations define an "arm's-length interest rate" for purposes of assessing transfer pricing between related entities as

a rate of interest which was charged, or would have been charged, at the time the indebtedness arose, in independent transactions with or between unrelated parties under similar circumstances. All relevant factors shall be considered, including the principal amount and duration of the loan, the security involved, the credit standing of the borrower, and the interest rate prevailing at the situs of the lender or creditor for comparable loans between unrelated parties. [26 CFR §1.482-2(a)(2)].

62.    Consistent with the plain meaning of reasonableness, which means fair, a reasonable rate pursuant to IRC §4975 is one that considers other market rates for similar products in arm's-length transactions.

63.    For example, the Department of Labor, which maintains enforcement authority with respect to the prohibited transaction rules in the IRC, provided in granting the exemption, a definition of "reasonable rate" that considered a broad range of similar products to bank deposit accounts:

A "reasonable" rate of interest means a rate of interest determinable by reference to short-term rates available to other customers of the bank, those offered by other banks, those available from money market funds, those applicable to short-term instruments such as repurchase agreements, or by reference to a benchmark such as sovereign short term debt (e.g., in the U.S., treasury bills), all in the jurisdiction where the rate is being evaluated.

64.    Three-month treasury bills, an instrument the Department of Labor has advised should be considered in determining a reasonable interest rate, rose in yield from 0.046% as of January 1, 2022 to 5.394% as of January 9, 2024. Nevertheless, Defendants paid interest rates during this period that were a tiny fraction of these rates.

65.     Compared to its competitors, the Sweep Program's interest rates are substantially lower than similar sweep products offered by other financial institutions. For example, Vanguard offered interest payments of 4.5% in its Cash Sweep Program; Moo Moo offered 5.1% in its Cash Sweep Program; and Fidelity offered 5%.

66.     Other brokerages that swept cash to unaffiliated banks set rates between brokerages and banks resulting from something that more closely resembles arm's-length negotiations. For example, Fidelity Investments and R.W. Baird do not sweep cash to affiliated banks, and have consistently paid substantially higher rates of interest than TD Ameritrade and other brokerages that sweep cash to affiliated banks.

67.     At year-end 2022, Fidelity paid 2.21% interest on cash balances regardless of tier, and R.W. Baird paid between 1.58% interest (on cash balances up to $1 million) and 3.08% interest (on cash balances above $5 million). By contrast, TD Ameritrade paid interest rates as low as 0.01%—virtually nothing.

68.     The federal funds target rate continued to increase in 2023 hitting an effective yield of 5.33% on July 27, 2023. As the federal fund rate increased, so too did Fidelity and R.W. Baird continue to increase the rates they paid on swept cash. TD Ameritrade, by contrast, continued to pay close to no interest.

69.     The rates set by Fidelity and R.W. Baird at arm's-length are evidence of the fair market or reasonable rates based on business and economic conditions. The rates set by TD Ameritrade, by default, in self-interested and affiliated transactions, were not reasonable.

70.     Even when measured against other brokerages who use sweep accounts, TD Ameritrade was near the bottom when it comes to interest rates on sweep accounts.

71.     TD Ameritrade's interest rates were significantly lower than its competitors, but they are also substantially lower than interest rates for money market fund rates. Nevertheless, TD Ameritrade automatically placed customers into the IDAs it developed with low yield rates that it negotiated with its Affiliated Banks.

72.     By negotiating significantly lower rates for the Sweep Program in which it automatically placed Plaintiff and Class members, TD Ameritrade did not act in its customers' best interests. Instead, TD Ameritrade put its own interests above theirs, making substantial net income revenue at its customers' expense. In so doing, Defendants breached their fiduciary duties.

## CLASS ACTION ALLEGATIONS

73.     Plaintiff brings this action individually and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the "Nationwide Class" consisting of:

All persons who held cash positions in retirement accounts custodied by TD Ameritrade and whose cash was deposited into IDAs through the TD Ameritrade Sweep Program from the earliest available date until the date when the TD Ameritrade retirement accounts were each transitioned into Charles Schwab retirement accounts and Charles Schwab's sweep program.

74.    Plaintiff also brings this action individually and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a "California Subclass" consisting of:

All California residents who held cash positions in retirement accounts custodied by TD Ameritrade and whose cash was deposited into IDAs through the TD Ameritrade Sweep Program from the earliest available date until the date when the TD Ameritrade retirement accounts were each transitioned into Charles Schwab retirement accounts and Charles Schwab's sweep program.

75.    Excluded from the Classes are (a) any Judge or Magistrate Judge presiding over this action and members of their immediate families; and (b) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents controlling interest and its current or former officers and directors.

**A. Numerosity - Rule 23(a)(1)**

76.    Class members are so numerous that their individual joinder is impracticable. The precise number of Class members and their identities are unknown to Plaintiff currently. However, TD Ameritrade oversaw over $1.3 trillion in client assets through the work of thousands of financial advisors, and Plaintiff

believes that the members of the proposed Classes number in the thousands. Accordingly, Plaintiff and the Classes satisfy the numerosity requirement of Rule 23(a)(1).

77.     Class members may be notified of the pendency of this action by mail, published notice, or other appropriate methods.

### B. Existence and Predominance of Common Questions of Law and Fact - Rule 23(a)(2), 23(b)(3)

78.     Common questions of law and fact exist as to all members of the Classes and predominate over questions affecting only individual Class members. These common legal and factual questions, each of which may also be certified under Rule 23(c)(4), include the following, whether:

    a.    TD Ameritrade owed fiduciary duties to Plaintiff and the putative Classes members in connection with the Sweep Program;

    b.    TD Ameritrade breached their fiduciary duties to Plaintiff and the putative Class members in  establishing, maintaining, and/or operating the Sweep Program;

    c.    TD Ameritrade's disclosures about the Sweep Program contained material misrepresentations or omissions;

    d.    TD Ameritrade breached their contracts with Plaintiff and the putative Class members regarding the Sweep Program, including the implied covenant of good faith and fair dealing;

e.  TD Ameritrade has been unjustly enriched because of the conduct complained of herein;

f.  TD Ameritrade's conduct regarding the Sweep Program violates the UCL;

g.  this case may be maintained as a class action under Fed. R. Civ. P. 23;

h.  to what extent Class members are entitled to damages and other monetary relief; and

i.  and to what extent Class members are entitled to attorneys' fees and costs.

### C. Typicality - Rule 23(a)(3)

79.    Plaintiff's claims are typical of the claims of the Classes because they were each a customer of TD Ameritrade that had their cash balances improperly managed by TD Ameritrade through its administration of the Sweep Program. Thus, Plaintiff's claims are typical of the claims of the members of the Classes as the claims arise from the same course of conduct by TD Ameritrade, and the relief sought within the Classes is common to the members of each.

### D. Adequacy of Representation - Rule 23(a)(4)

80.    Plaintiff will fairly and adequately protect the interests of Class members. Plaintiff has retained counsel competent and experienced in complex class action litigation, and Plaintiff will prosecute this action vigorously. Plaintiff has no

interests adverse or antagonistic to those of the Class.

### E. Superiority - Rule 23(b)(3)

81.     A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class members are small compared with the burden and expense that would be entailed by individual litigation of their claims against TD Ameritrade. It would thus be virtually impossible for the Class members, on an individual basis, to obtain effective redress for the wrongs done them.

82.     Even if Class members could afford individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

83.     Additionally, the Classes may be certified under Rule 23(b)(1) and/or (b)(2) because:

    a. the prosecution of separate actions by individual Class members would
       create a risk of inconsistent or varying adjudications with respect to

individual Class members that would establish incompatible standards of conduct for TD Ameritrade;

b. the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

c. TD Ameritrade acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class members as a whole.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### BREACH OF FIDUCIARY DUTY
(Asserted on behalf of the Plaintiff and the Nationwide Class against Defendants)

84.    Plaintiff repeats and incorporates by reference the factual allegations in paragraphs 1 through 83, above, as if fully set forth herein.

85.    At all relevant times, TD Ameritrade owed fiduciary duties to Plaintiff and the members of the Class in connection with the Sweep Program. Such duties independently arose out of (1) the agency relationship between TD Ameritrade, on one hand, and Plaintiff and the members of the Class on the other hand, as to the Sweep Program; (2) TD Ameritrade's holding and control over beneficial funds that

belonged to its customers, related to their cash sweep balances; (3) TD Ameritrade's discretion as to the Sweep Program and their customers' cash, while acting as their agent; and/or (4) the applicable industry standards, including Reg BI and FINRA standards.

86.     As a fiduciary to Plaintiff and the Class, Defendants owed them the highest duties of loyalty, candor, due care, and prudence in as to the services they provided to them in connection with establishing, maintaining, and/or operating the Sweep Program. Moreover, as a fiduciary, TD Ameritrade had a continuing duty to act exclusively for the benefit of Plaintiff and the Class in connection with establishing, maintaining, and/or operating the Sweep Program. Lastly, as a fiduciary, TD Ameritrade had a continuing duty to obtain informed consent from Plaintiff and the Class regarding the Sweep Program and specifically make sufficiently detailed disclosures regarding the Sweep Program, their role, the role of various related parties, and any conflicts of interest to obtain such informed consent.

87.     TD Ameritrade further owed Plaintiff and the Class the fiduciary duty to act in good faith in connection with establishing, maintaining, and/or operating the Sweep Program.

88.     TD Ameritrade further owed Plaintiff and the Class the duty to charge reasonable fees for their services related to the Sweep Program.

89.     Plaintiff and the Class were fully dependent upon TD Ameritrade's

ability, skill, knowledge, and goodwill with respect to the Sweep Program.

90.     TD Ameritrade owed Plaintiff and the Class similar duties by virtue of their control over TD Ameritrade's policies or management regarding Sweep Program.

91.     TD Ameritrade breached their fiduciary duties by the conduct alleged herein, including by designing, structuring, and/or operating the Sweep Program to benefit themselves at the expense of their fiduciary customers, making material misrepresentations and omissions regarding the Sweep Program, violating its duty of care, and acting in their own – not their customers' – best interest vis-à-vis the Sweep Program.

92.     TD Ameritrade violated their duty of loyalty by, among other things, putting their interest above that of their fiduciary customers, failing to provide sufficient information to their fiduciary customers regarding material features of the Sweep Program to obtain informed consent from them, and not properly disclosing their own and their affiliates' role in, and conflicts of interest arising out of the Sweep Program, as more fully shown above.

93.     As a direct and proximate consequence of TD Ameritrade's conduct as alleged herein, Plaintiff and the Class suffered damages in an amount to be determined at trial and seek disgorgement of any undue and unjust gains of TD Ameritrade, as well as all other equitable relief deemed just and proper.

## SECOND CAUSE OF ACTION
### BREACH OF CONTRACT

(Asserted on behalf of the Plaintiff and the Nationwide Class against Defendants)

94.    Plaintiff repeats and incorporates by reference the factual allegations in paragraphs 1 through 83, above, as if fully set forth herein.

95.    TD Ameritrade's relationship with its customers is governed by a written contract, the terms of which are contained in, and incorporated into various standardized documents drafted by TD Ameritrade, as outlined above.

96.    One such document is the Client Agreement. To become a customer of TD Ameritrade, each member of the Class was required to agree to the terms of the Client Agreement.

97.    The Client Agreement expressly incorporates the Applicable Rules of applicable federal, state, and self-regulatory organizations.

98.    As stated above, multiple regulatory organizations, including the IRS, the Department of Treasury, and FINRA, require that interest rates paid on cash swept into IDAs at TD Ameritrade's Affiliated Banks be "reasonable."

99.    TD Ameritrade undertook to act as an agent of the customers regarding all transactions relating to the Sweep Program and were thus contractually obligated to obtain for Plaintiff and members of the proposed Class, through such transactions, rates of return on their cash balances that are reasonable and to otherwise act in their customers' best interests.

100.   As set forth herein, the rates of return paid to customers on their cash balances were not reasonable and TD Ameritrade did not act in their customers' best interests. Accordingly, TD Ameritrade breached their contracts with Plaintiff and the members of the proposed Class.

101.   Plaintiff and the members of the proposed Class suffered monetary damages because of TD Ameritrade's breach of contract.

### THIRD CAUSE OF ACTION
### BREACH OF THE IMPLIED COVENANT
### OF GOOD FAITH AND FAIR DEALING
(Asserted on behalf of the Plaintiff and the Nationwide Class against Defendants)

102.   Plaintiff repeats and incorporates by reference the factual allegations in paragraphs 1 through 83, above, as if fully set forth herein.

103.   A covenant of good faith and fair dealing is implied into every contract.

104.   Plaintiff and Class members contracted with TD Ameritrade to provide them with financial and/or investment services pursuant to the Client Agreement. Under the Client Agreement, TD Ameritrade was the agent of Plaintiff and Class members and owed them fiduciary duties, including to act in their best interests. TD Ameritrade failed to obtain for Plaintiff and Class members higher and reasonable rates of return on their cash balances and instead acted in their own interests. Moreover, under the Client Agreement, as broker-dealers and pursuant to Reg. BI and 84 Fed. Reg. 134, 17 C.F.R. § 276, TD Ameritrade had a duty to act in the best interests of Plaintiff and Class members and not put their interests above Plaintiff

and Class members.

105.    These contracts were subject to implied covenants of good faith and fair dealing that all parties would act in good faith and with reasonable efforts to perform their contractual duties (both explicit and implied) and not to impair the rights of other parties to receive the rights, benefits, and reasonable expectations under the contracts. These included the covenants that TD Ameritrade would act fairly and in good faith in carrying out their contractual obligations to provide Plaintiff and Class member with fair and reasonable rates of return on their cash sweep balances.

106.    TD Ameritrade breached these implied covenants of good faith and fair dealing by failing to provide Plaintiff and Class member with fair and reasonable rates of return on their cash sweep balances. TD Ameritrade, instead of providing fair and reasonable rates of return on their customers' cash sweep balances, provided far below market rates of return that their customers could have otherwise earned on their cash. TD Ameritrade acted dishonestly and failed to exercise and/or abused their discretion in selecting the banks which would hold Plaintiff and Class members' cash balances and in failing to negotiate reasonable rates of interest but instead negotiated higher rates of interest and fees for themselves.

107.    Plaintiff and Class members fulfilled all the terms and obligations of their contract, including paying for TD Ameritrade's services.

108.    TD Ameritrade's failure to act in good faith in providing fair and

reasonable rates of return on their customers' cash sweep balances denied Plaintiff and Class members the full benefit of their bargain. Plaintiff and Class members received a minimal return on their cash sweep balances that were less than what they could have otherwise earned and less than their reasonable expectations under their contract with TD Ameritrade.

109.   As a result of TD Ameritrade's breach of the implied covenant of good faith and fair dealing, Plaintiff and Class members sustained damages in an amount to be determined by this Court, including interest on all liquidated sums.

**FOURTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**
(Asserted on behalf of the Plaintiff and the Nationwide Class against Defendants)

110.   Plaintiff repeats and incorporates by reference the factual allegations in paragraphs 1 through 29 and 32 through 83, above, as if fully set forth herein.

111.   This claim is plead in the alternative to the claims for breach of contract and breach of the implied covenant of good faith and fair dealing.

112.   Because of TD Ameritrade's wrongful conduct as alleged herein, Plaintiff and Class members received lower interest payments on their cash sweep balances than they would have in a reasonable and fair market.

113.   Because of TD Ameritrade's wrongful conduct as alleged herein, TD Ameritrade unjustly received a benefit at the expense of Plaintiff and Class members in the form of increased interest income that belonged to Plaintiff and Class

members.

114.    It would be unjust and inequitable to allow TD Ameritrade to retain these wrongfully obtained benefits.

115.    Plaintiff and Class members are entitled to restitution and disgorgement of the benefits unjustly obtained, plus interest, in an amount to be proven at trial.

**FIFTH CAUSE OF ACTION**
**VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW**
(Asserted on behalf of the Plaintiff Masud and the California Subclass against Defendants)

116.    Plaintiff repeats and incorporates by reference the factual allegations in paragraphs 1 through 83, above, as if fully set forth herein.

117.    The UCL prohibits, and provides civil remedies for, unfair competition.  Its purpose is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services.  In service of that purpose, the Legislature framed the UCL's substantive provisions in broad, sweeping language.

118.    By defining unfair competition to include any "any unlawful, unfair or fraudulent business act or practice," the UCL permits violations of other laws to be treated as unfair competition that is independently actionable, and sweeps within its scope acts and practices not specifically proscribed by any other law.

119.    TD Ameritrade's conduct as described herein violates the UCL.

120.    Specifically, TD Ameritrade's conduct was not motivated by any

business or economic need or rationale. The harm and adverse impact of TD Ameritrade's Sweep Program and its use of IDAs was neither outweighed nor justified by any legitimate reasons, justifications, or motives.

121.    The harm to Plaintiff Masud and members of the Subclass arising from TD Ameritrade's unfair practices outweighs the utility, if any, of those practices.

122.    TD Ameritrade's conduct was substantially injurious to accountholders in that they have been deprived of fair, market rate interest payments.

123.    As a result of TD Ameritrade's violations of the UCL, Plaintiff and members of the Subclass have paid, and/or will continue to suffer actual damages in the form of lost interest.

124.    Plaintiff Masud alleges that TD Ameritrade has, in the course of their business and the course of trade or commerce, undertaken and engaged in unfair business acts and practices by, among other things, engaging in transactions relating to the Sweep Program to generate substantial revenue for themselves with their customers' cash and beneficial returns on such cash, while paying their customers only a small fraction of those returns and concealing from such customers the portions of those customers' returns that they directed to and conferred upon their affiliates and the fact that those portions represented the vast majority of such interest. TD Ameritrade further engaged in material misrepresentations and omissions regarding key features of the Sweep Program.

125.    The deceptive business acts or practices described herein presented a threat and likelihood of harm and deception to Plaintiff and the Class in that TD Ameritrade has systematically perpetrated the unfair conduct upon members of the public by engaging in the conduct described herein.

126.    As a result of TD Ameritrade's misrepresentations and omissions of material facts concerning the Sweep Program, Plaintiff and the Class have suffered an ascertainable loss of money, property, and/or value and were harmed and suffered actual damages.

127.    Plaintiff also alleges that TD Ameritrade has, in the court of their business and the course of trade or commerce, undertaken and engaged in unlawful business act and practices by, among other things, structuring their Sweep Program to sweep customers' uninvested cash into IDAs held at their Affiliated Banks, yet refusing to pay a reasonable rate of interest on the cash in the IDAs, in violation of the statutes and regulations discussed above.

128.    Defendants' unlawful conduct caused financial harm to Plaintiff and the Subclass by depriving them of legally entitled interest payments, resulting in monetary damages. As a direct and proximate result of Ameritrade's violations, Plaintiff has suffered economic injury, entitling them to restitution, injunctive relief, and other remedies permitted under the law.

129.    Had Plaintiff and the Class been aware of the TD Ameritrade's

conduct with respect to the transactions relating to the Sweep Program, which greatly favored TD Ameritrade and their affiliates at their fiduciary customers' expense, Plaintiff and the Class would not have participated in those investment products or would have done so on different terms.

## PRAYER FOR RELIEF

Plaintiff requests relief as follows:

1. Certification of the Class;

2. A declaration that the Sweep Program violates Plaintiff's and Class Members' rights;

3. Actual damages;

4. Punitive damages;

5. Injunctive relief prohibiting TD Ameritrade from continuing to engage in the conduct alleged herein;

6. Attorneys' fees and costs of suit;

7. Prejudgment interest; and

8. Such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all claims so triable.

Dated:      December 24, 2024      Respectfully submitted,


**SHAMIS & GENTILE, P.A.**
*/s/ Andrew J. Shamis*
Andrew J. Shamis, Esq.
Florida Bar No. 101754
ashamis@shamisgentile.com
14 NE 1st Avenue, Suite 1205
Miami, Florida 33132
Telephone: 305-479-2299

**EDELSBERG LAW, P.A.**
Scott A. Edelsberg, Esq.*
Florida Bar No. 100537
scott@edelsberglaw.com
Adam A. Schwartzbaum, Esq.*
Florida Bar No. 93014
adam@edelsberglaw.com
20900 NE 30th Ave Suit 417
Aventura, FL 33180
Tel: 305-975-3320

Jeff Ostrow*
**KOPELOWITZ OSTROW FERGUSON
WEISELBERG GILBERT**
One West Las Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Tel: (954) 525-4100
ostrow@kolawyers.com

*Counsel for Plaintiff and the Proposed
Class*

*Pro Hac Vice Applications forthcoming